WATKINS v. PARKER, Deputy Commissioner, United States Employees' Compensation Commission, et al.

No. 2603.

District Court, D. Maryland.

Jan. 22, 1944.

96

Herbert B. Fineberg, of Baltimore, Md., for claimant.

Roszel C. Thomsen, of Baltimore, Md., for employer and insurance carrier.

COLEMAN, District Judge.

This case is brought by an employee's widow to review and revise an award of the Deputy Commissioner of the United States Employees' Compensation Commission appointed pursuant to the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901–950, inclusive.

The employee, claimant's husband, age thirty-eight, was employed by Robert C. Herd & Company, Inc., as a stevedore, and on August 7, 1940, while working as such in No. 4 hold of the SS Mount Pelion in Baltimore Harbor, a steel beam fell into the hold striking him and causing a fracture of his left clavicle (collar bone), a laceration of the scalp and a cerebral concussion with hemorrhage. There is no dispute as to the Deputy Commissioner's findings of fact in so far as they relate to the occurrence and character of the injury to the deceased employee, the medical and surgical treatment which he received for it, and the circumstances surrounding his death on August 21, 1942, that is to say, more than two years after the accident. We, therefore, quote the following statement of facts as they appear in the Deputy Commissioner's findings upon which he based his award: "That immediately following the injury, the employee was treated in the accident room of the hospital for his fractured clavicle and laceration of scalp, and then sent home; that on August 27, 1940, after having a seizure on the street resembling epilepsy, he was returned to the hospital; while in the hospital on the examining table, he had another seizure; he remained in the hospital until September 13, 1940; that on admission his blood pressure was elevated and he was disoriented; that examination of the spinal fluid on August 30th showed same to be yellowish, an indication of subarachnoid hemorrhage; that during his hospitalization several tests were made for blood syphilis, some of which were positive and some were negative; that examination of the spinal fluid for syphilis was negative; examination at the time showed the employee had serious heart disease and disease of the entire vascular system, which conditions had been present for some time before the injury; that under treatment at the hospital he improved and was discharged on September 13, 1940; thereafter he continued under the care of physicians as an out-patient until June 6, 1941, when he was readmitted to the hospital; at this time he was irrational and restless, requiring a restraint sheet for the first few days; he then improved and was discharged July 2, 1941. He was given antisyphilitic treatment. He then continued under treatment as an out-patient; his previous mental confusion seemed to improve and he stated he felt better. On August 18, 1942, his condition became much worse, and he was readmitted to the hospital in a comatose state; his blood pressure had fallen, and there was definite Cheyne-Stokes breathing; there was a generalized flaccid paralysis; examination of the spinal fluid showed there was no pressure, and the fluid was clear; death occurred on August 21, 1942."

On these facts the Deputy Commissioner's conclusion as to the employee's death was stated as follows: "that death was caused by vascular disease of the brain, but not related directly or by way of aggravation with the injury sustained on August 7, 1940". The Deputy Commissioner did, however, find that as a result of the injury the employee had thereafter been totally disabled until his death, which was compensable at the rate of $18 per week, and that for the permanent partial disability of the deceased employee's left arm, the claimant, his widow, was entitled to compensation pursuant to Sections 8(c) (1) and 8(d) (1) of the Act, 33 U.S.C.A. § 908, (c) (1), (d) (1), for 70 weeks at $18 a week, effective August 22, 1942. Claimant contends that there was causal connection between the injury to her husband and his death and that instead of merely an award for disability, which the Deputy Commissioner has allowed, she is entitled to death benefits pursuant to the provisions of the Act.

It, therefore, becomes our duty to determine whether the award which the Deputy Commissioner has made is in accordance with law. If it is not, the Longshoremen's and Harbor Workers' Compensation Act expressly provides, 33 U.S.C.A. § 921(b), that it may be suspended or set aside in whole or in part. This means that the award of the Deputy Commissioner may be altered if, but only if, there was no substantial evidence before him to support his findings. In other words, it is not the weight of the evidence that must control us, nor whether the court necessarily agrees with the Deputy Commissioner's conclusion, but merely whether there is evidence present in the record in this case as it comes from him sufficient to justify his findings. There can be no trial de novo of the facts in the absence,—which is the case here,—of a jurisdictional question. South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 60 S.Ct. 544, 84 L. Ed. 732; Parker v. Motor Boat Sales, 314 U.S. 244, 62 S.Ct. 221, 86 L.Ed. 184. Nor is there any provision in the Act giving this court power to remand the case in order that additional testimony may be presented.

This case presents somewhat unusual, and what may be called border line circumstances. It is rendered the more difficult also by the fact that the employee at the time he entered the employment of the defendant company was not given a thorough physical examination, at least not such examination as was ever made a matter of record. Also no autopsy was made.

As to medical and surgical testimony, the Deputy Commissioner heard a neurologist and psychiatrist produced on behalf of claimant; and a general surgeon and neurologist who testified on behalf of the employer and insurance carrier. The first of these witnesses never saw the deceased and, therefore, based his opinion upon an examination of the rather voluminous hospital records. Summarizing his testimony it was to the effect that there was a direct causal connection between the blow which the employee received on his head, and his death which followed two years later, namely, that the head injury caused a severe brain disturbance, producing a traumatic brain disease which was a direct contributory cause of the death.

The second medical witness, a general surgeon, saw the patient for the first time about three weeks after the injury and a number of times off and on thereafter, up until about two months before he died, this witness being one of the surgeons at the Maryland General Hospital where the deceased was hospitalized for the various periods of time which have been summarized in the statement of facts heretofore given. There is, however, found in this witness' testimony no definite statement of conclusion as to whether there was any causal connection between the injury and the death. The medical certificate of another attending physician in the hospital gave as the immediate cause of death, "central nervous system syphilis".

The third and remaining physician who testified, namely, Dr. Spear, a well-known neurologist of Baltimore, first saw the deceased some 9 months after he was injured and thereafter at repeated intervals until the day he died. Dr. Spear was very emphatic in his conclusions. He testified that the immediate cause of death was a vascular lesion, that is, a clotting of blood in the medulla,—the brain stem,—but that the head injury had nothing whatever to do with producing this condition; although he further stated it was his belief that the head injury did cause a temporary increase in the vascular disease with which the deceased had long been afflicted, but that the lesion or stoppage in the medulla occurred in an entirely different part of the brain from that which was injured by the blow on the head, and that while this blow did cause a partial permanent disability of the left side, it had no causal connection with the death. In short, Dr. Spear testified that the head injury probably prolonged life in that, if the deceased had not been rendered totally disabled for work by this injury, and had kept on working as a stevedore, in all likelihood he would have died a year earlier. Dr. Spear's conclusions are succinctly embraced in the three following questions and his answers thereto:

"Question: So that this man had one kind of a hemorrhage, or a hemorrhage in a particular area of his brain at the time of his accident, and he had another kind at the time of his death in another part of the brain, but there was no relation between the two? Answer: No relation between the two, no, sir.

"Question: This weakness of his arm, that was due to the injury on the right side of the brain, it was not due to his clavicle fracture? Answer: Oh, no, sir.

"Question: But it did affect the use of that arm? Answer: Yes."

At the close of the hearing, the Deputy Commissioner being conscious of the fact that the case was not free from difficulty, and that it was desirable for him to be in possession of the best and most impartial professional testimony that it was possible to obtain, suggested to counsel that he would like to have the benefit of the opinion of a brain surgeon,—it is to be noted that none of the witnesses were such,—or in lieu thereof, the benefit of the opinion of another and neutral neurologist. This suggestion was accepted by counsel as satisfactory to them, with the result that the Deputy Commissioner asked Dr. F. R. Ford, another well-known neurologist of Baltimore, to review the entire record in the case and to render a written statement of his conclusions as to the cause of death. This Dr. Ford did and he thus summarized his opinion:

"1—The patient clearly suffered a head injury on August 7, 1940, which might be properly termed concussion.

"2—There are a number of statements in the record to the effect that the patient's blood pressure was elevated (170/110 at times); that his arteries were thickened (arteriosclerosis); that his heart was enlarged and that he had cardiac murmurs. Such a condition might be a result of syphilis of the blood vessels or might occur for no apparent reason. There is certainly evidence in the record that the patient had syphilis of the blood vessels, but I don't believe that it is so unequivocal that the diagnosis of syphilis has to be accepted. However, there is conclusive evidence of disease of the vascular system of some type.

"3—The convulsion of August 27, 1940, might have been a result of this concussion or of his vascular disease. Possibly both factors played a role.

"4—The persisting disability following this episode of August 27, 1940, might likewise be a result of either vascular disease (high blood pressure, etc.) or of the injury. I see no possible way of determining which played the greater part in his symptoms.

"5—The patient's death on August 21, 1942, two years after the head injury, in my opinion, could not be a result of that injury. The notes describing his terminal symptoms, I believe, strongly indicate that he died of disease of the blood vessels of the brain. In all probability one of the vessels became plugged or occluded, thus arresting the nutrition of the brain and causing his unconsciousness and death. I cannot state with confidence what part of the brain was affected. I do not know of any possible way in which an injury to the head such as this patient suffered could cause death or contribute to the cause of death in such a manner after such a lapse of time. On the other hand, it is very common indeed for persons suffering from disease of the blood vessels to die in just this fashion."

Therefore, it will be seen that in reaching the conclusion that there was no causal connection between the head injury and death, the Deputy Commissioner adopted the views of Dr. Spear and Dr. Ford. Claimant contends that such conclusion is so contrary to the necessary, reasonable presumption to be derived from all the facts and circumstances in the case, as to warrant a determination that the opinion of these professional men is not to be treated as substantial evidence. With this we cannot agree. As already explained, the function of this court in reviewing the action of the Deputy Commissioner is narrow. It is limited exclusively to a determination as to whether there is substantial evidence to support the Deputy Commissioner's findings, and that, therefore, it is not the weight of the evidence that must control us, nor whether we necessarily agree with the Deputy Commissioner's conclusion, but simply whether there was evidence before him sufficient to justify his findings. In the present case the Deputy Commissioner's conclusion is directly and unequivocally supported by the views of one of the three doctors who testified before the Commissioner, and by the written opinion of Dr. Ford who, although not testifying, nevertheless must be treated as though he had done so, because his written statement was, by stipulation of all parties, made a part of the record in the case, to be considered as though it came from a witness.

The court is aware of the fact that an employee subject to the provisions of the Longshoremen's and Harbor Workers' Compensation Act, or his representative, is usually at a considerable disadvantage as contrasted with the employer and insurance carrier, with respect to ability to present medical testimony at the hearing before a

Deputy Commissioner. This means that the latter should satisfy himself in all cases that the medical testimony, which he does hear, is competent and sufficiently comprehensive. The court is satisfied that such was true in the present case, although it would have been helpful if counsel for all parties concerned, as well as the Deputy Commissioner himself, had made some additional effort to have a brain surgeon testify, because of the complicated, and to the lay mind, the obscure, perplexing character of the prolonged illness of the deceased. However, as already explained, we are satisfied that there is ample, competent medical evidence to support the Deputy Commissioner's conclusions.

Neurology is that branch of science which treats of the nervous system, and, therefore, essentially of the brain. Thus, the field of study and practice of the brain surgeon must include that of the neurologist. Whether, had the testimony of a brain surgeon been added to the testimony in the case, it would have clarified the issue, we can only speculate. Presumably it would have been helpful, but we consider it in no sense indispensible.

An order will be signed affirming the award of the Deputy Commissioner.